# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SHANNON M. WHEELER,**

    **Plaintiff,**

  **v.**            **Case No. 08-C-1005**

**BRADY CORPORATION,**

    **Defendant.**

---

# DECISION AND ORDER

---

The Plaintiff Shannon M. Wheeler ("Wheeler") filed this action against her former employer, the Defendant, Brady Corporation ("Brady") alleging violations of Sections 703 and 704 of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-2. Wheeler alleges that, throughout her employment with Brady, she was treated less favorably based upon her sex, harassed based upon her sex, forced to work in a hostile work environment, retaliated against for opposing discriminatory practices in the workplace, and constructively discharged.

The Court has federal question jurisdiction over of this matter, pursuant to 28 U.S.C. §1331, because it arises under federal law. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c). This matter is before the Court on Brady's motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56, dismissing the entire action. In opposition to the motion, Wheeler asserts that several material issues of genuine fact exist that preclude resolution of this matter on summary judgment. The motion is addressed herein.

## Summary Judgment Standard

In deciding Brady's motion for summary judgment, the Court applies the following standards. When considering a motion for summary judgment, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

Case 2:08-cv-01005-RTR   Filed 05/06/10   Page 2 of 52   Document 48

Rule 56(e)(2) addresses the opposing party's obligation to respond stating "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Furthermore, in determining the material and undisputed facts, the Court has disregarded those proposed findings of fact and responses that constituted legal conclusions, were argumentative or irrelevant, or those that were not supported by the cited evidence or by citations specific enough to alert the Court to the source for the proposal. The Court also notes that, under this District's Civil Local Rule 56(b)(2)(B)(i), "mere disagreement with the movant's asserted facts is inadequate [to defeat summary judgment] if made without reference to specific supporting material." *See Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)).

### Relevant Facts[1]

Brady is an international manufacturer and marketer of products that identify and protect premises, products, and people. Its products help customers in safety, security, productivity and performance and include high performance labels and signs, safety devices, printing systems and software, and precision die-cut materials. Brady employs approximately 7,800 workers and its corporate headquarters are located in Milwaukee, Wisconsin.

---

[1]The relevant facts are taken from the parties' proposed findings of fact ("PFOF") to the extent that they are undisputed. Citations to quoted excerpts have been included even when the facts are undisputed.

Brady has argued that facts set forth in Wheeler's proposed findings but not used in her brief should be disregarded. However, Brady has not presented any legal authority in support of that request and, therefore , has not established a basis for exclusion of Wheeler's proposed factual findings on that ground.

Brady prohibits discrimination of any kind, including sexual harassment and retaliation from reporting sexual harassment. Brady's anti-discrimination policies are set forth in its Code of Ethics as well as its *Team Member Handbook*. The policies are also available to Brady employees at all times on Brady's intranet. Within 90 days of a new employee's hiring date, Brady trains all new employees on its sexual harassment policy. Brady also reminds its employees of their obligations under its sexual harassment policy through annual training on its Code of Ethics.

Brady's anti-harassment policy contains a complaint procedure that encourages employees to immediately report any complaints or concerns of any harassment to their supervisor or the Human Resources Department. On receiving any complaint of harassment, it is Brady's policy and practice to conduct a prompt and thorough investigation into the allegations made. Brady's Human Resources Department typically conducts all harassment investigations. Harassment investigations consist of interviewing the complainant, any witnesses who may have knowledge of the allegations, and the alleged harasser, as well as reviewing any relevant documentation. Based on the results of the harassment investigation, Brady decides on the appropriate course of action, including any warranted disciplinary action.

At all times relevant to this lawsuit, Brady had a North American sales division that was divided into seven sales regions: Northeast, Southeast, Mid-South, West Belt, Central, Northwest, and Southwest. Each sales region is lead by a regional manager who works almost entirely in the field. Approximately ten to 12 territory managers within each sales region

support and report to the regional manager. Each sales region is also assigned technical support and customer service personnel as well as an inside sales representative.

Wheeler, who resides in Wauwatosa, Wisconsin, began her employment at Brady in 2004 as an inside sales representative. Wheeler signed an acknowledgment on February 3, 2004, that she had received, read and understood Brady's Code of Ethics. On February 4, 2004, Wheeler acknowledged that she had received training on the *Team Member Handbook* and that she was instructed that she could access it through Brady's intranet.

The role of an inside sales representative is to follow up on trade show and industry sales leads, also referred to as dispositions, and to submit those sales leads to the territory managers. All inside sales representatives, regardless of their sales region, report to and are supervised by the inside sales manager. All inside sales representatives as well as the inside sales manager are located at Brady's corporate headquarters.

As of 2005, Wheeler's immediate supervisor was Barb Bartelt ("Bartelt"), the inside sales manager for Brady's North American Sales Division. Bartelt had the authority to hire, fire or promote the inside sales representatives, and was responsible for completing the performance evaluations and talent reviews for the inside sales representatives.

Wheeler's compensation was a combination of salary and commission earnings. Starting in 2005, Wheeler's sales territory covered the Northeast region. While she was assigned to that region, Wheeler's commission was roughly $1,000 per month.

Beginning in September 2005, Wheeler worked exclusively as an inside sales representative for the Northeast sales region. Her work hours were 7:00 a.m. to 3:00 p.m.,

5

Monday through Friday. In 2005 through 2007, Wheeler's performance reviews were consistently at "meets expectations" and her talent reviews were at "full leadership potential."

Talent reviews evaluate whether an employee possesses the qualifications and skills to advance from his or her current position at Brady. The general practice at Brady is that talent reviews are not distributed to inside sales representatives and remain with the inside sales manager. A designation of "full leadership potential" on a talent review indicates that an inside sales representative does not have the qualifications or skills to be promoted above his or her current position. A designation of "future growth potential" on a talent review indicates that an inside sales representative has the qualifications and skills to be promoted above his or her current position.

Brady's policy is that inside sales representatives are required to have at least one phone call each month with their regional managers. (Declaration of Shannon McDonald (McDonald Decl.) ¶ 3, Ex. B (Joe Antonacci ("Antonacci")) Dep. 16-17.)

At all times relevant to this action, Antonacci was the regional manager for the Northeast sales region – a position which he had held since 2000. Antonacci, who was physically located in St. Louis, Missouri, traveled to Brady's Milwaukee headquarters about four times a year. He also had a cubicle in the Milwaukee headquarters. As the regional manager, Antonacci supervises the territory managers for the Northeast sales region.

Antonacci had no authority to hire, fire or promote the inside sales representative assigned to his region.[2] Antonacci also did not provide information to support the

---

[2]Wheeler maintains that Antonacci had a apparent authority to terminate her employment. (*See* Pl.'s Resp. Def.'s PFOF ¶ 27.)

performance evaluations or talent reviews of the inside sales representatives assigned to his region.

As a part of his responsibilities as the Northeast regional manager, Antonacci had a monthly telephone call with the inside sales representative assigned to his sales region to discuss sales activity and objectives. It was also customary for Wheeler to communicate with Antonacci regarding her "success stories" because those were successes within his territory.

On one occasion, Antonacci observed Wheeler making the telephone sales calls and provided her with advice on her sales techniques. According to Antonacci, on one occasion, in 2006, Bartelt requested that Antonacci observe an inside sales representative making a sales call. (McDonald Aff. ¶ 3, Ex. B 11-12.) At the time, Wheeler was the only inside sales representative in his territory, so Antonacci decided to observe Wheeler. (*Id.*)

According to Bartelt, she told Antonacci to observe Wheeler. (Bartelt Supp. Aff. ¶ 4.) Antonacci's observations of Wheeler making the sales telephone calls had no bearing on Wheeler's performance evaluation or talent review. (*Id*. at ¶ 4.)

On January 4, 2007, Wheeler acknowledged that she received, read and understood Brady's Code of Ethics, which included its sexual harassment policy.

In late June 2007, Bartelt promoted Rachel Zweck ("Zweck"), an inside sales representative, to the position of "Team Lead." The Team Lead assisted Bartelt in overseeing inside sales and had supervisory authority over the inside sales representatives. Wheeler believed that the way that Bartelt selected Zweck as the Team Lead was unfair and "lacked

equal opportunity." Wheeler felt that she was qualified to be Team Lead and wanted to be considered for the position. Wheeler was also upset by Zweck's promotion because she felt that Bartelt always compared Wheeler's sales numbers and Zweck's sales numbers.

On June 29, 2007, after learning about Zweck's promotion, Wheeler made an internal telephone call to Pam Zak ("Zak"), the inside sales representative for the Southwest sales region. During their telephone conversation Wheeler and Zak made disparaging remarks about Zweck and stated that they wanted her to fail in her new position. Wheeler said that her sales numbers were better than Zweck's and that she "was going to prove that [she] could beat [Zweck's] sales numbers." (McDonald Aff. ¶ 2, Ex. A (Wheeler Dep.) 109.) Zak responded that "she thought that [Zweck] would pretty much not be able to handle [Bartelt's] abrasiveness." (*Id*.) They criticized Bartelt and agreed that Wheeler should contact Antonacci to find out why Zweck was selected to be the Team Lead.

Wheeler was not aware that, at that time, Brady was investigating Zak for unethical behavior and recording all of her telephone calls. After reviewing the telephone conversation between Zak and Wheeler, Brady issued Wheeler a written warning on July 13, 2007. When Wheeler received the written warning she "cried because [she] was upset, because [she'd] never been written up before, but [she] did not read the warning." (McDonald Decl. ¶ 2, Ex. A 119.) Wheeler was upset "at the whole . . . everything was coming to a head with the problems with [Antonacci] that [she] was dealing with, and when [she] read it, [she] was just upset." (*Id*.)

Zweck subsequently approached Wheeler and asked why she made the disparaging comments about her. Wheeler responded that she already received discipline for the comments and that she intended to beat Zweck's sales numbers. (McDonald Decl. ¶ 2, Ex. A 123.)

Sometime in mid-to-late July 2007, after receiving the written warning, Wheeler called Antonacci to ask if he knew why Zweck was selected over her to be the Team Lead. During the conversation, Wheeler also stated that she believed that she was a much better employee than Zweck and that she – Wheeler – should have been considered for the position. Although she called Antonacci, Wheeler did not know whether Antonacci was responsible for selecting Zweck. Nonetheless, Wheeler felt comfortable speaking to Antonacci about that matter as well as any other business-related matters.

In response to Wheeler's inquiry about why she was not selected for the Team Lead position, Antonacci referred to Wheeler's talent review and told her that she should meet with her supervisor, Bartelt, to discuss it. There is a factual dispute regarding the precise statement made by Antonacci regarding the talent review. According to Antonacci, he said that her talent review "must not be as stellar" as she thought it was. (McDonald Decl. ¶ 3, Ex. B 54, 87.) According to Wheeler, he said that her "talent review was less than stellar." (McDonald Decl. ¶ 2, Ex. A 123.) Antonacci had not seen or discussed any of Wheeler's performance evaluations or talent reviews and was not responsible for selecting Zweck as the Team Lead.

After speaking with Antonacci, Wheeler called Bartelt to ask about her talent review and whether it was less than stellar. Bartelt informed Wheeler that her talent review was at full leadership potential. Wheeler told Bartelt that Antonacci had said that her talent review was less than stellar. Bartelt responded that "[w]ell, you need to go back to him and ask him what that's all about." (McDonald Decl. ¶ 2, Ex. A 124.) She also stated "there is no basis for that comment." (*Id.* ) Sometime thereafter, Bartelt provided Wheeler with a copy of her talent review. Wheeler was not aware that a talent review rating of "full leadership potential" made her ineligible for advancement at Brady.

After speaking with Bartelt, Wheeler called Antonacci a second time and left him a voice message. Antonacci claims that Wheeler was "heated" and "emotional" and expressed the fact that she felt passed over for the Team Lead. Antonacci did not speak to Wheeler again after these telephone communications in mid-to-late July 2007.[3]

Following Wheeler's receipt of the warning, Jason Stobba ("Stobba"), of Brady's Human Resources Department gave Wheeler some company information regarding how to deal with difficult people, and asked her to see him if she had any problems whatsoever. After reading the material, Wheeler realized that she should have gone to Human Resources about "everything that's happened with [Antonacci]." (*Id.* at 141.)

---

[3]Paragraph 58 of the Defendant's Proposed Findings of Fact upon which this statement is based reads that Antonacci never had any "communications" with Wheeler after their mid-to-late July conversations. Although Wheeler did not respond to the proposed fact and, therefore, admitted it, the statement is at least arguably inconsistent with the e-mails exchanged between them on July 24, 2007. *See* infra at 19-20. Page 87 of Antonacci's deposition testimony, cited by Brady as the basis for paragraph 58 of its proposed findings of fact, indicates that he never spoke to Wheeler again after the telephone conversations of mid to late July. Therefore, the Court revised the statement to reflect that Wheeler and Antonacci did not speak to each other again.

*Wheeler's Meeting With Stobba About Antonacci*

On August 9, 2007, Wheeler met with Stobba to report harassing conduct by Antonacci. Wheeler had misgivings about reporting the conduct, because 13 years earlier at a prior job she had reported sexual harassment which had caused her to lose that prior job.

That day, and during an August 13, 2007, follow-up meeting, Wheeler made a series of allegations regarding Antonacci that dated back to June 2006. Stobba took notes reflecting Wheeler's complaints during both meetings.

First, Wheeler stated that, sometime before July 27, 2006, Antonacci invited her to attend an after work meeting for the Northeast regional sales teams at a Tumbleweeds restaurant ("Tumbleweeds") near Brady's headquarters.[4] (McDonald Decl. ¶ 2, Ex. A 50-52.) Antonacci had informed Wheeler that Bartelt had told him that it was important for regional managers to get better acquainted with their inside sales representatives. (*Id.* at 52-53.) Antonacci was late for the July 27, 2006, Tumbleweeds meeting; Wheeler was the only other Brady employee who appeared at the meeting. (*See id.* at 58.)

_____

[4]There is a genuine factual dispute regarding whether Wheeler and Antonacci had met prior to the Tumbleweeds meeting. Antonacci claimed that they had not previously met each other. (McDonald Decl. ¶ 3, Ex. B 27.) Wheeler testified that they first met in June 2006 when Antonacci kissed her at the Brady headquarters. (McDonald Decl. ¶ 2, Ex. A 32-36.)

Wheeler reported that, during the meeting, Antonacci touched her bare leg below the hem of her Capri pants[5] and asked whether she shaved for him. She also stated that Antonacci said that she was beautiful and asked if she had ever been in a lesbian relationship, if she had naked pictures of herself when she was pregnant and inquired as to her favorite sexual positions. Sometime during the meeting in response to Antonacci's questions regarding Wheeler's son, including how old she was when her son was born, whether she was married at that time, and how she supported her son, Wheeler indicated that she had worked at a "gentleman's club." (*Id*. at 62.)

Second, Wheeler stated that an employee in Brady's IT (information technology) department had told her that Antonacci had asked him about getting pornographic pictures of pregnant women. Third, Wheeler stated that sometime in the summer of 2006, Antonacci came to her cubicle and made a loud kissing noise in hopes that another employee would hear the noise and think something was going on between them.

Fourth, Wheeler reported that Antonacci asked her to join him for dinner several times; she declined. On one of those occasions, Wheeler suggested that Khristine Klimowicz ("Klimowicz"), another inside sales representative who had been Wheeler's friend since they attended high school, join them. Wheeler related that Antonacci said that he did not want Klimowicz there, she should tell Klimowicz that she could not attend, and that he stated "three strikes and you are out." (*Id*. at 77-78.)

---

[5]Capri pants are "women's close-fitting trousers with tapering legs, reaching to just above the ankle." *See* http://dictionary.oed.com (last visited April 28, 2010).

Fifth, Wheeler stated that Antonacci visited corporate headquarters and that they greeted each other with a hug and "accidently kissed on the lips."[6]  There is a factual dispute between the parties as to when the kiss occurred.  According to Wheeler, it occurred in June 2006 (*Id*. at 33-35); but, according to Antonacci, it occurred in early 2007.  (McDonald Decl. ¶ 3, Ex. B 20-22.)  When Antonacci was asked if he was sure that the kiss occurred in 2007, Antonacci stated that he was "[o]ne hundred percent positive that it was in 2007."  (*Id*. at 22.)

Wheeler claimed that Antonacci's behavior toward her changed after she declined his dinner invitations.  Specifically, she claimed Antonacci commented that her talent review was "less than stellar" and that he was not copying her on emails regarding the sales region and he told her not to copy him on her e-mails because they were jamming up his Blackberry. (Stobba Aff. ¶ 21, Ex. L DEF-0467-0468.)  Wheeler reported that Antonacci was excluding her from communication.  (*Id*. at DEF-0467.)

After airing her complaints, Wheeler stated that she wanted to be transferred away from the region.  She also told Stobba that she "asked to be transferred to the SE (Southeast) region but was denied.  (She did not share this info with [Bartelt].)"  (Stobba Aff. ¶ 15, Ex. F DEF-0456; *See also* Stobba Aff. ¶ 15, Ex. E DEF-0420.)

Stobba told Wheeler that her complaints were confidential, that Brady would immediately investigate her allegations and that she should have no communications with

---

[6]Stobba's notes from Wheeler's August 13, 2007, interview indicate that she told him that the kissing incident was an accident and that she was embarrassed about the situation.  (Stobba Aff. ¶ 21, Ex. L.)  Stobba's notes also show that Wheeler did not report the accidental kiss to him during their August 7, 2007, meeting.  (Stobba Aff. ¶ 13, ¶ 15, Ex. E & F.)

During her deposition, Wheeler testified that Antonacci approached her in the hallway and kissed her on the lips.  (McDonald Decl. ¶ 2, Ex. A 35.)

Antonacci. Stobba also asked Wheeler to provide him with copies of any emails or other communications that supported her allegations about Antonacci.

### *Stobba's Interviews of Other Employees*

On August 9, 2007, the same day that Wheeler complained to the Human Resources Department, Stobba interviewed Antonacci, Bartelt, Klimowicz and other employees who might have had knowledge of Wheeler's allegations regarding Antonacci. Stobba, along with other representatives from Brady's Human Resources Department and in-house counsel, conducted follow-up interviews with Antonacci, Bartelt and Klimowicz in the week following Wheeler's initial complaint. Stobba took notes during all the interviews.

### *Antonacci Interview*

When Stobba confronted Antonacci over the phone about Wheeler's allegations he was shocked and denied the majority of her accusations. Antonacci admitted that he had met Wheeler at Tumbleweeds during one of his quarterly visits to Brady's corporate headquarters.[7] He indicated that Bartelt had encouraged the meeting so that Antonacci and Wheeler could get to know each other and discuss business objectives. However, Antonacci denied touching Wheeler's leg or asking her during that meeting whether she shaved for him. He also denied asking Wheeler about sexual positions, photos of herself when she was pregnant, or lesbian tendencies.

Antonacci stated that topics of a sexual nature came up during the meeting only because Wheeler volunteered the fact that she previously worked at a "gentleman's club" and

---

[7]There is a factual dispute between the parties regarding whether Antonacci and Wheeler had met prior to meeting at Tumbleweeds. (*See* Pl.'s Resp. Def.'s PFOF ¶ 76.)

had overcome a great deal of adversity during her life.  At his deposition, Antonacci claimed that Wheeler mentioned lesbian tendencies and drug use as part of the environment she encountered while working at the gentleman's club.

Antonacci acknowledged that during another quarterly visit to corporate headquarters, well after the summer of 2006, he ran into Wheeler and she kissed him on the lips.[8]  (Stobba Aff. ¶ 23, Ex. N.)  After the incident, Bartelt called Antonacci and stated that Wheeler had contacted her and that Wheeler would be calling him to apologize, which she did.

Antonacci acknowledged that during another visit to corporate headquarters, in the fall of 2006, he invited Wheeler to go out for lunch or dinner and that she responded by asking whether Klimowicz could come too.[9]  Antonacci also admitted that he had a conversation with a Brady IT department employee about nude pictures for a bachelor party he was attending for his son's best friend.[10]

Regarding Wheeler's talent review, Antonacci claimed he never said it was "less than stellar."[11]  Rather, in response to Wheeler's complaint regarding Zweck's promotion,

----

[8]There is a factual dispute about whether the kiss incident occurred in 2006 or 2007 and who kissed whom. (*See* Pl.'s Resp. to Def.'s PFOF ¶ 80.)  However, the statement is a summary of Stobba's interview(s) of Antonacci; e.g., Antonacci's response to Wheeler's claims about him.  Wheeler has not raised a factual dispute as to what Antonacci told Stobba.

[9]There is a factual dispute about whether Antonacci invited Wheeler out for lunch or dinner or whether his invitation was limited to dinner.  (Pl.'s Resp. to Def.'s PFOF ¶ 82.)  There is a factual dispute between the parties' versions of Antonacci's response to Wheeler's request that Klimowicz come with them.  (*See id.*)  However, the statement is a summary of Stobba's interview of Antonacci; e.g., Antonacci's response to Wheeler's claims about him. Wheeler has not raised a factual dispute as to what Antonacci told Stobba.

[10]There is a factual dispute about whether Antonacci specifically asked IT for pictures of nude pregnant women or whether the pictures were offered to him.  (*See* Pl.'s Resp. to Def.'s PFOF ¶ 83.)

[11]Wheeler's response to Brady's proposed finding of fact regarding the comments that Antonacci made to her attempts to raise a factual dispute about what he said to her about the talent review.  (*See* Pl.'s Resp. to Def.'s PFOF ¶ 84.)  However, the proposed finding is a summary of Stobba's interview of Antonacci; e.g., Antonacci's

Antonacci stated that Wheeler's talent review must not be as stellar as she thought it was and that she should call Bartelt to discuss it. At the time, Antonacci attempted to explain the meaning of the talent review designations to Wheeler.

Antonacci asked Stobba to speak with Bartelt because Antonacci had previously informed her that he did not feel comfortable being alone with Wheeler and that she gave him a "creepy" feeling. Specifically, Antonacci visited corporate headquarters in June 2007 and did not want to meet with Wheeler alone, so he asked Bartelt and Julie Krupa ("Krupa"), an intern, to join them.

Stobba directed Antonacci to have no communication with Wheeler. He also advised Antonacci that Brady prohibited sexual harassment, their discussion was entirely confidential, and, that he would be in contact with Antonacci regarding the on-going investigation.

*Bartelt Interview*

In response to Stobba's inquiry about Wheeler and Antonacci, Bartelt stated that Antonacci previously informed her that he felt uncomfortable being alone with Wheeler and that he believed there was a misunderstanding between them. Bartelt knew that, in the past, Antonacci did not want to go to lunch with Wheeler alone and had asked Bartelt to join them.[12]

_____

response to Wheeler's report of harassment. Wheeler has not raised a factual dispute as to what Antonacci told Stobba.

[12]The statement is a summary of Stobba's interview of Bartelt; e.g., what Bartelt told Stobba in response to him asking what she knew about Antonacci and Wheeler. There is a factual dispute between the parties regarding whether Wheeler ever invited Antonacci to lunch. (*See* Pl.'s Resp. to Def.'s PFOF ¶ 88.) Notwithstanding that dispute, Wheeler states that in October or November 2006, she indicated that she "would go to lunch with him, if there was so much important things that he needed to talk about." (*See id.* (citing Wheeler Dep. 85(Ex. A to McDonald Decl.) ).) In any event, Wheeler has not raised a factual dispute about the content of Stobba's interview of Bartelt regarding what she knew about Antonacci and Wheeler.

Bartelt acknowledged that, previously, Wheeler had approached her and reported that she accidentally kissed Antonacci, that she was embarrassed, and that she did not know what to do about the situation.[13]  Bartelt advised Wheeler to call Antonacci, to explain that the kiss was unintentional and to apologize for any misunderstanding.  To make sure that Antonacci understood the inadvertent nature of the kiss and as a favor to Wheeler, Bartelt also called Antonacci and advised him of her prior conversation with Wheeler.

Bartelt acknowledged that Antonacci called her in July 2007 to report Wheeler's inquiry regarding Zweck's promotion.  As to whether Antonacci told Wheeler that her talent review was "less than stellar," Bartelt believed that the comment was taken out of context.

### Klimowicz Interviews

During her interviews with the Human Resources Department, Klimowicz[14] stated that she was aware that Wheeler felt uncomfortable around Antonacci and that he had said things to Wheeler that were inappropriate and made her feel uncomfortable.  Wheeler had told Klimowicz that Antonacci had asked her about her sexual preferences, whether she had

---

[13]There is a factual dispute between the parties regarding what Wheeler told Bartelt about the kiss and how the kiss occurred; that is, who kissed whom.  (*See* Pl.'s Resp. to Def.'s PFOF ¶ 89.)  There is also a dispute about whether Bartelt mocked Wheeler about the kiss incident.  (*See id.*)  In her supplemental affidavit, Bartelt avers that she never asked Wheeler whether she "gave . . . Antonacci any tongue" or mocked her about the accidental incident.  (Bartelt Supp. Aff. ¶ 5.)  However, Wheeler has not raised a factual dispute about what Bartelt told Stobba.

There is also a related factual dispute about whether Wheeler ever complained to Bartelt about Antonacci.  (*See* Pl.'s Resp. to Def.'s PFOF ¶ 91.)  Wheeler claims that she complained to Bartelt about Antonacci twice: 1) when he kissed her; and, 2) when she requested that she be transferred to the Southeast region.  (*Id.*)  According to Bartelt, Wheeler never reported a complaint to her about Antonacci.  (Bartelt Aff. ¶ 16.)  In her supplemental affidavit, Bartelt also avers that Wheeler did not accuse Antonacci of any wrongdoing in connection with the kissing incident.  (*See* Bartelt Supp. Aff. ¶ 5.)

[14]Klimowicz described Wheeler as a "close friend."  They were high school classmates, attend the same church, and Wheeler married Klimowicz's best friend's brother.  Wheeler referred Klimowicz for employment at Brady.

naked pictures of herself when she was pregnant, whether she shaved her legs for him, and whether she would go to Lake Geneva with him. Wheeler told Klimowicz that Antonacci had asked her out to dinner on one occasion but that she did not want to go alone and wanted Klimowicz to go too.

Klimowicz did not witness the alleged kissing incident between Antonacci and Wheeler. However, from subsequent conversations with Wheeler, Klimowicz understood it to be an accident resulting from an awkward hug. Klimowicz did not believe that Wheeler blamed Antonacci for the kissing incident.[15]

Klimowicz did not hear Antonacci make kissing noises in Wheeler's cubicle or hear him asking Wheeler to have an affair with him. She did hear Antonacci whispering to Wheeler for about 20 minutes. After his departure, Wheeler told Klimowicz that Antonacci was trying to convince Wheeler to start a rumor that Wheeler and Antonacci were having an affair.

In the past, Klimowicz and Wheeler had discussions about Wheeler's prior employment at a strip club. Klimowicz never personally witnessed or overheard inappropriate behavior between Antonacci and Wheeler.

Klimowicz repeatedly advised Wheeler to talk to the Human Resources Department if she had a problem with Antonacci. Klimowicz believes that the Tumbleweeds

_____

[15]At her deposition, Klimowicz testified that Wheeler told her that she had been coming down the hallway and Joe and some other people were there and they went and just hugged and "then it was an awkward, where you accidentally turn the opposite way with someone, and then they kiss. But it was an accident." (McDonald Aff. ¶ 4, Ex. C (Klimowicz Dep.) 12.) Klimowicz testified that Wheeler "was really upset just because – it was just how she was upset. . . . She was just – how somebody would be upset if they had a really awkward hug that turned into a kiss with a coworker. . . . It was awkward. And it was embarrassing." (*Id*. at 13.)

18

incident and the kissing incident occurred in the summer of 2006.  (McDonald Aff. ¶ 4, Ex. C (Klimowicz Dep.) 59).

<em>Orcholski Interview</em>

On August 9, 2007, Stobba met with Scott Orcholski ("Orcholski"), who worked in Brady's IT Department.  Orcholski recalled a conversation in the summer of 2005 when Antonacci had stated that he was attending a bachelor party, that the bride was pregnant and that he was trying to find inappropriate images for the party.

<strong><em>Emails and Document Review</em></strong>-

On August 13, 2007, Wheeler provided Stobba with emails that she believed supported her claims against Antonacci. Wheeler sent an email to Antonacci and others on September 13, 2006, stating the following: "I [j]ust got the awesome news from the March Madness Contest — thank you so much!!!  I am really excited to start learning how to use the IPOD and the Bose system and extremely grateful to be part of the Northeast team!!" (Stobba Aff. ¶ 24, Ex. P.)  The same day,  Antonacci responded to the email, stating the following: "please do me a favor and DO NOT copy me on anything you automatically generate from TJ Group (NetDoc demo/seminar is schedule, no action on your part).  For some reason, these lock up my computer.  As always, I still want ANYTHING you want me to know." (Stobba Aff. ¶ 24; Ex. P).

Wheeler sent an email to Antonacci on July 24, 2007, stating that she had not received notice from him regarding a colleague's mother passing away or that another employee, Krupa, had left Brady. That same day Antonacci responded with an email stating:

19

"Shannon, no problem. I haven't sent out any broadcast message yet on Julie, and I was on vacation when Bob's Mom died."  (Stobba Aff. ¶ 24, Ex. O DEF-0381.)

As part of the investigation of Wheeler's complaint, Stobba had Brady's IT Department created a copy of Antonacci's entire computer hard drive.  The IT Department provided Stobba with copies of all emails between Antonacci and Wheeler.  Stobba also reviewed Antonacci's personnel file to determine whether there were any prior complaints of harassment made against him.  The review showed that Antonacci had never been accused of harassment or formally disciplined for any reason.

In 2005, however, Antonacci made a comment that was interpreted by a female employee as disparaging to working mothers.  Antonacci subsequently explained that the female employee misunderstood his comment and apologized to her for any confusion.

As a part of the investigation of Wheeler's complaint, Kristina Ebbens ("Ebbens"), attorney for Brady, sent out a litigation hold which identified Wheeler as a person who had made a complaint of sexual harassment.  The litigation hold did not name Antonacci or Bartelt.

### *Wheeler's Transfer*

On August 23, 2007, Stobba and Bartelt met with Wheeler and informed her that they were granting her request to transfer from the Northeast sales region and that they had arranged for her to join the Mideast sales region.  At that time, Wheeler did not object to the transfer.  The transfer to the Mideast sales region enabled Wheeler to maintain her same

20

position as an inside sales representatives and did not affect her wages, benefits or working conditions, including her base salary and bonus targets, in any manner.

On August 24, 2007, Stobba sent Wheeler an email confirming their conversation of the prior day that her transfer would take effect on August 27, 2007. The email added that the transfer should eliminate any communication between her and Antonacci and that she should immediately report any contact from him to the Human Resources Department or Bartelt.

On August 27, 2007, Wheeler responded to the August 24, 2007, email from Stobba and stated that she did not consider the transfer to be an acceptable solution and that she believed Brady was trying to hurt her and her career. Later that day, Stobba and Bartelt met with Wheeler and she informed them that she wanted to be transferred to the Southeast sales region and that she did not want to attend the National Sales Meeting for fear of seeing Antonacci. Bartelt informed Wheeler that she had already hired a new employee for the opening in the Southeast sales region. Stobba also stated that Wheeler's transfer to the Mideast sales region was already finalized and that he would follow up with her regarding her attendance at the National Sales Meeting.

### Southeast Sales Position

Brady terminated the employment of Zak, the inside sales representative for the Southeast region, for unethical behavior on July 13, 2007. Immediately thereafter, Bartelt posted a job opening on Brady's intranet as well as with other external websites for the

position. Thirty-five people applied for the position, including six Brady employees. Wheeler was not aware of the job posting on Brady's intranet and never applied for the position.

Sometime after receiving her written warning, Wheeler claims that she made a verbal request to Bartelt about transferring to the Southeast sales region.

Within one week of posting the opening, Bartelt interviewed a candidate, Joe Welch ("Welch"), who was highly recommended by another Brady employee. After a second interview, Brady offered the position to Welch. He accepted it on August 7, 2007.

*National Sales Meeting*

Every year Brady holds a National Sales Meeting for all inside and outside sales personnel. The purpose of the meeting is to review sales objectives and strategies for the upcoming year and attendance is mandatory.

On August 28, 2007, Bartelt and Stobba met with Wheeler to confirm her transfer to the Mideast region and their expectation that she attend the National Sales Meeting the following week. Bartelt assured Wheeler that Al Wagner ("Wagner"), the regional manager for the Mideast sales region, was supportive of the transfer and confident that she would succeed in the region. Stobba added that Antonacci was under strict instructions not to be in contact with her at the National Sales Meeting and that Bartelt would make certain there was no interaction between the two of them. Wheeler asked them why she had to attend the National Sales Meeting, whereas the previous year she had been excused from attending that meeting so she could stand up for a wedding. (McDonald Aff. ¶ 2, Ex. A 150.) Wheeler

said that she would not attend the National Sales Meeting and that she would get a note from her doctor letting her stay home.

Later in the day, on August 28, 2007, Wheeler sent an email to Stobba, copying her attorney, stating that she would not be attending the National Sales Meeting because she did not want to be in the same vicinity as Antonacci and that her heart specialist would provide her with a medical excuse. Wheeler subsequently requested and received Family and Medical Leave Act ("FMLA") covering two weeks in September 2007, including the time period of the National Sales Meeting. Wheeler had no contact with Antonacci at any National Sales Meetings she had previously attended.

### *Antonacci's Written Warning*

On August 29, 2007, after Brady completed its investigation of Wheeler's complaint, Mark Konopacke ("Konopacke"), the Director of Sales, and Stobba met with Antonacci and issued him a final written warning for violating Brady's policy prohibiting sexual harassment as well as its IT policy prohibiting unapproved software installation.[16] Konopacke explained that there was evidence supporting the fact that Antonacci had engaged in inappropriate conversations of a sexual nature with Wheeler during the Tumbleweeds meeting and that he had requested inappropriate images from Brady's IT Department in 2005. They further advised Antonacci that Brady did not tolerate harassment and that any future violations would be grounds for dismissal.

---

[16]Relying on Antonacci's deposition testimony, Wheeler disputes the proposed finding of fact upon which the statement is based. (*See* Pl.'s Resp. Def.'s PFOF ¶ 125.) However, she is challenging Antonacci's credibility by raising the dispute – not the basis for the proposed finding of fact.

Antonacci was directed to have no contact with Wheeler and to avoid her work area when he was at corporate headquarters. Antonacci did not agree that he had violated Brady's policy prohibiting harassment or that he should have been given the final written warning.

### Wheeler's Complaint About Bartelt

On October 31, 2007, Wheeler sent an email to Stobba stating that Bartelt had developed an "attitude" towards her ever since she reported her complaint about Antonacci. Specifically, she claimed Bartelt was ignoring her and that she was not receiving sufficient sales leads in her new region. She also claimed that Bartelt was isolating her from co-workers by not greeting her whereas she greeted other employees, giving her looks of distrust and treating Wheeler as if she was not a member of the Brady team.

After reviewing the email, Stobba immediately met with Bartelt to investigate Wheeler's complaint. Bartelt denied any negative treatment of Wheeler and advised Stobba that she was having less frequent communication with the inside sales representatives because of Zweck's promotion to Team Lead. Bartelt also stated that Wheeler was not being denied sales leads.[17]

On November 1, 2007, Stobba sent an email to Wheeler informing her that he spoke with Bartelt, that she denied any negative treatment of her and that he was confident that she would succeed in her new position.

---

[17]Wheeler asserts that she was denied sales leads and attempts to raise a factual dispute relying on her own e-mail discussing sales leads. (*See* Pl.'s Resp. Def.'s PFOF ¶ 131 (citing Ex. U to Stobba Aff.).) However, Wheeler's e-mail does not raise a factual dispute as to what Bartelt said to Stobba.

24

On November 5, 2007, Wheeler sent another email to Stobba alleging that Bartelt and Zweck "refuse[d] to acknowledge the problems caused" by her "lack of sales leads" and that she wanted to return to the Northeast sales region. Wheeler stated that in the Northeast region she had 2,777 leads most of which were original; whereas in the Mideast region she had only 422, with the majority being duplicates. (Stobba Aff. ¶ 38, Ex. O.) Wheeler stated that the lack of sales leads caused her not to meet any of her goals and cost her the commission and bonuses that she had been earning in her previous position. (*Id.*) Wheeler's commissions after she was transferred to the Mideast team were roughly $200 per month.

Wheeler acknowledged that apart from her belief that she was not receiving sufficient sales leads, she had no complaints about working for the Mideast sales region. Stobba responded that he was out of the office until November 7, 2007, and that he would meet with her to discuss her latest complaint as soon as he returned.

### *Wheeler's Resignation After Seeking Other Employment*

On November 7, 2007, Wheeler sent an email to numerous persons at Brady advising that she was giving her two-weeks notice and that she believed she was being forced to resign. Wheeler had applied for another job in the end of October 2007. She began working at her new place of employment in November 2007.

### *Sales Comparisons*

In fiscal year 2007 – August 1, 2006 to September 30, 2007– the total number of dispositions, or sales leads, provided to the inside sales representative assigned to the

Mideast sales region was 9,546. In fiscal year 2007, the total number of dispositions provided to the inside sales representatives assigned to the Northeast sales region was 8,896.

In fiscal year 2007, the monthly disposition averages for inside sales representatives assigned to the Mideast and Northeast sales regions were 796 and 741 respectively. Brady's regional sales rankings for fiscal year 2007 listed the Mideast sales region at 97 percent of its sales goals and the Northeast sales region at 96 percent of its sales goals.

### *Procedural Background*

On September 28, 2007, Wheeler, with assistance from counsel, cross-filed a charge of discrimination with the State of Wisconsin Department of Workforce Development ("DWD")[18] and the U.S. Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment and retaliation against Brady. During the investigation of her charge, Wheeler made the following allegation:

> In or around August 2006, Mr. Antonacci conducted an inside sales meeting discussion Occupation Safety and Health Administration (OSHA) requirements . . . During his presentation,. . . Antonacci used . . . Wheeler as a subject of a sales hypothetical, telling the group in a sexually suggestive manner, "If I were trying to date . . . Wheeler, I would need to know her likes and dislikes. I would need to know what makes her tick and what turns her on."

(C. Ann Martin ("Martin") Supp. Aff. ¶ 2; Ex. A at 6.)

On July 24, 2008, Wheeler cross-filed a second charge of discrimination with

---

[18]The Equal Rights Division ("ERD") of the DWD is Wisconsin's fair employment agency that may investigate a Title VII charge. *See Wisconsin Employment Law,* § 14.204 (4th ed. 2009).

the EEOC and the DWD alleging retaliation for filing a previous complaint with the DWD against Brady. On August 1, 2008, Wheeler cross-filed a third charge of discrimination with the EEOC and the DWD alleging retaliation against her by Brady.

On May 6, 2008, the DWD issued a decision in Wheeler's first sexual harassment and retaliation case against Brady. The DWD determined that Wheeler's allegations of sexual harassment were time barred by the 300-day statute of limitations and that no probable cause existed to believe any discrimination had occurred against her by Brady. Upon an appeal of that determination, by a decision dated July 25, 2008, an DWD Administrative Law Judge ("ALJ") affirmed that Wheeler's allegations of sexual harassment were time-barred.

On October 10, 2008, at Wheeler's request, without making a determination as to the merits of her claim, the EEOC issued Wheeler a Notice of Right to Sue on her first charge of discrimination against Brady. On November 10, 2008, at Wheeler's request and without making a determination as to the merits, the EEOC issued Wheeler right to sue letters on her second and third charges of discrimination against Brady. Thereafter, on November 21, 2008, Wheeler filed the instant lawsuit under Title VII, as amended.

### *Dr. Daniel Mui*

Wheeler first informed her healthcare provider, Dr. Daniel Mui ("Mui"), that she was experiencing anxiety, stress and chest pains because of her work on May 11, 2005.

On May 15, 2005,[19] Wheeler asked that Mui prescribe medication for anxiety that she was experiencing, and reported that her son was going to be deployed to Iraq. (Supp. Martin Aff. ¶ 5, Ex. C.)

On August 31, 2007, Wheeler first informed Mui that she was being harassed at work and that the harassment began in June of 2006. At that time, Wheeler also informed Mui that she failed to report the harassment in the past because she was concerned about her son being in Iraq. She also reported that the Human Resources Department was not permitting her to transfer to a different sales region.

On September 12, 2007, Wheeler visited Mui. On that date, Wheeler informed Dr. Mui that she already "ha[d] interviews for new jobs." (Martin Supp. Aff. ¶ 7, Ex. E.) On September 19, 2007, Wheeler visited Mui and told him "she had several interviews [for other employment] that went well." (Martin Supp. Aff. ¶ 8; Ex. F.) During an October 31, 2007, visit to Mui, Wheeler said that she "has [a] new job that she will begin in 2 weeks. She has 1 week of work remaining." (Martin Supp. Aff. ¶ 9; Ex. G.)

### Antonacci's Requests for Pornography & His Comments

Jim Douglas ("Douglas"), who was employed at Brady from March 2001 through November 2005, as a PC (personal computer) specialist, recalls that on several occasions Antonacci came to the IT department inquiring where he could find naked pictures of pregnant women on the internet. Antonacci also inquired about other forms of

---

[19]Brady incorrectly refers to the date as being May 15, **2006**, which conflicts with date stated in paragraph five of the Supplemental Martin Affidavit and on exhibit C, to which it refers. (*See* Def.'s Resp. Pl.'s PFOF ¶ 30.) The Court has corrected the error.

pornography, but he was specifically interested in naked pictures of pregnant women. Antonacci always initiated these discussions; the IT department employees did not initiate the discussions regarding pornography with Antonacci.

Antonacci made inappropriate comments in front of employees other than Wheeler. In about 2002, at a trade show in St. Louis, Antonacci told Zak that the women attending the show were "butt ugly." (Zak Aff. ¶7.) For several days after the show, he continued to make inappropriate comments about the women at the show.

### Brady's Discovery Responses

In this action, Wheeler's attorneys served discovery on Brady, including requests for admissions and interrogatories. Admission number 34 asked Brady to "Admit that Bartelt told Wheeler she could not be transferred to the Southeast region." Brady responded by denying the request, and "[a]ffirmatively alleg[ing] that in July 2007 . . . Bartelt informed [Wheeler] that the [i]nside [s]ales [r]epresentative position for the Southeast sales region had been filled by another person." (McDonald Aff. ¶ 6, Ex. E ¶ 34.) However, in response to interrogatory 11, Brady states that "Welch was hired for the position [in the southeast region] on August 7, 2007. (McDonald Aff. ¶ 5, Ex. D ¶ 11.)

Brady clarifies that it interviewed Welch – who was highly recommended by another Brady employee – for the opening in the southeast region in mid-July 2007, and that given Welch's strength as a candidate, the posting for the opening was withdrawn on July 23, 2007, and additional applicants were not considered. Accordingly, Bartelt considered the position filled at that time, although Welch's official hire date was not until August 7, 2007.

29

Admission number 28 asked Brady to "[a]dmit that Wheeler asked Bartelt if she could be transferred to another region to get away from Antonacci." (McDonald Aff. ¶ 6, Ex. E ¶ 28.)  Admission number 31 asked Brady to "[a]dmit that Wheeler asked Bartelt if she could be transferred to the Southeast region in July, 2007 to distance herself from Antonacci." (McDonald Aff. ¶ 6, Ex. E ¶ 31.)  Brady denied both requests for admissions. However, in its response to interrogatory number ten, Brady stated "Brady transferred [Wheeler] to Mideast [r]egion after [Wheeler] requested to be transferred away from . . . Antonacci and the Northeast [r]egion." (McDonald Aff. ¶ 5, Ex. D ¶ 10.)  The interrogatory identifies Bartelt as a person involved in the decision to transfer Wheeler.

## Analysis

### *Sexual Harassment Claim*

#### *Timeliness of Charge*

In seeking summary judgment, Brady contends that, as a threshold matter, Wheeler's allegations regarding Antonacci's inappropriate conduct cannot be considered by this Court when assessing her sexual harassment claim, because they did not occur within 300 days of when she filed her EEOC charge.   Furthermore, contends Brady, the continuing violation doctrine cannot save Wheeler's untimely claim.   Wheeler contends her charge was timely.

Before bringing a lawsuit under Title VII, a plaintiff is required to file a charge of discrimination with the EEOC.  *See* 42 U.S.C. § 2000e-5(e)(1).  Because Wisconsin is a "deferral state," meaning it has a state agency with enforcement powers parallel to those of the

30

EEOC, a charge of discrimination actionable under federal law is timely if it is filed with the ERD within 300 days of the alleged discriminatory act. *See id.;* 29 C.F.R. 1601.80*; See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Moreover, "[t]he continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period." *See Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir. 1995); *see also Morgan*, 536 U.S. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.") A series of harassing acts may fall within the doctrine so long as they are part of an alleged continuing hostile environment claim and at least one such harassing act took place during the limitations period. *Morgan*, 536 U.S. at 113.

Failure to timely file an administrative charge is an affirmative defense, and the burden of proof at summary judgment therefore rests on the defendant. *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009). Summary judgment is appropriate only if Brady demonstrates the absence of a genuine factual dispute over whether Wheeler's charge was timely filed. *See id.*

Wheeler filed her first charge with the DWD on September 28, 2007. Wheeler alleges a series of allegedly harassing acts – and there are genuine disputes of material fact regarding the dates of some of those acts. At this stage of the proceedings, the facts must be viewed in the light most favorable to Wheeler. According to Antonacci, the kissing incident

occurred in early 2007.  Additionally, according to Wheeler, Antonacci harassed her at a Brady meeting regarding OSHA requirements in January or February 2007.  If either date is found to be the date on which harassment occurred, Wheeler's sexual harassment charge would be timely under the continuing violation doctrine.  Determination of the dates and nature of those events involves issues of credibility are not subject to resolution upon summary judgment.  *See Chelios v. Heavener*, 520 F.3d 678, 688 (7th Cir. 2008).  Thus, at this juncture of the proceedings, Brady has not established that, as a matter of law, Wheeler's sexual harassment charge is untimely.  *See Laouini*, 586 F.3d at 475-76.

*Objective Hostility of Conduct*

Brady also contends that circumstances of which Wheeler complains do not rise to the level of an objectively hostile work environment.  Wheeler disputes Brady's contention in this regard.

In order to establish a *prima facie* case of sexual harassment under Title VII, a plaintiff must show that: 1) she was subjected to unwelcome harassment; 2) the harassment was based on her sex; 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and, 4) there is a basis for employer liability.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007).

To satisfy the third prong, Wheeler must demonstrate that Antonacci's behavior was both objectively and subjectively offensive.  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).  Wheeler's August 2007 complaint to Stobba provides sufficient evidence

that she was subjectively offended by Antonacci's comments, and Brady does not claim otherwise. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000) (recognizing that a jury reasonably could find, based on an employee's complaints to a superior, that the employee perceived her environment as hostile).

Courts look to several factors to determine whether alleged harassment was objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance. *Id.* at 806-07. The "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995).

Wheeler's complaint to the Human Resources Department highlighted five instances of harassment by Antonacci. The first incident of which Wheeler complained, and the most humiliating, was the Tumbleweeds meeting, where Antonacci touched her below the hem of her Capri pants (somewhere below her mid-calf), and asked her if she had shaved for him. He also told her she was beautiful, asked her whether she had been in a lesbian relationship, whether she had any photographs of herself naked while she was pregnant, and which sexual positions were her favorites. This incident involved physical touching, but the area where Antonacci touched – the area below the hem of Wheeler's Capri pants – is not an intimate body part. His inquiries regarding any lesbian relationships, nude photographs of Wheeler while she was pregnant, and her favorite sexual positions were offensive utterances

that were inappropriate and unwelcome. However, the severity of those comments and the conduct is somewhat tempered by the fact that these comments and the touching occurred outside of the workplace – the Tumbleweed's bar – and after Wheeler's disclosure to Antonacci that she had been employed at a gentleman's club.

The second incident of which Wheeler complained was of Antonacci's request to the IT department for pornographic photographs of pregnant women. Wheeler was not a party to that incident and only learned of it from an IT department employee. "Through the grapevine" or "second-hand" conduct, is not sufficiently severe or pervasive to create a hostile work environment. *See Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1046 n.9 (7th Cir. 2000).

The third incident of which Wheeler complained was when Antonacci came to Wheeler's cubicle and made loud kissing noises in the hope that another employee would overhear the noise and believe that they were having an affair. This conduct was annoying, but it was not physically offensive and occurred on a single occasion. Zak apparently heard the loud kissing noises and Klimowicz heard Antonacci whispering in Wheeler's cubicle for 20 minutes – perhaps somewhat unusual activity for a manager. There is no indication that anyone other than Zak heard the kissing noises or that Antonacci triggered the rumor that he was having an affair with Wheeler.

The fourth incident of which Wheeler complained was that Antonacci extended several dinner invitations to her, and that when she suggested that Klimowicz accompany them, he said "three strikes and you are out." Although the dinner invitations were unwanted and annoying, Wheeler was able to decline. While Antonacci hastily rejected Wheeler's

suggestion that Klimowicz join them and said "three strikes and you are out," Stobba's interview notes state that Wheeler did not understand what Antonacci meant by the comment. (*See* Stobba Aff. ¶ 15, Ex. F.) In the context, the comment does not have an obvious meaning.

Did it mean that after the third refusal or unsatisfactory response, Antonacci would stop asking Wheeler to dinner or stop pursuing her? There is no evidence as to what Antonacci meant or what Wheeler thought he meant. The only evidence is that Wheeler did not understand what Antonacci's comment meant. Considered in the light most favorable to Wheeler, the evidence could be construed as the comment was troubling to Wheeler because of her uncertainty as to what Antonacci meant by it.

The fifth incident of which Wheeler complained was the kissing incident. In assessing this incident, the Court accepts for the purposes of summary judgment that Antonacci gave Wheeler an unwanted kiss on the lips in the hallway of Brady's headquarters. According to Wheeler, this incident occurred in June 2006, before the July 26, 2006, Tumbleweeds meeting. This physical contact was unexpected and it was upsetting to Wheeler who reported it to her supervisor, Bartelt, and her friend – Klimowicz.

Wheeler also claims that she told Stobba of Antonacci's alleged improper conduct at an OSHA meeting at Brady headquarters in 2007.[20] According to Wheeler, Antonacci used her as an example in discussing as to how to get past a gatekeeper, suggesting as to how he would approach Wheeler if he was dating her or wanted to date her. There is a

---

[20]There is a factual dispute between the parties regarding whether Wheeler's harassment complaint to Stobba regarding Antonacci included the OSHA meeting incident. (*See* Def.'s Resp. Pl.'s PFOF ¶ 30.) Stobba's notes regarding his interviews of Wheeler do not include any mention of the alleged OSHA meeting. (Stobba Aff. ¶¶ 13, 15 & 21, Ex. E, Ex. F., Ex. L.)

factual dispute between the parties as when the meeting occurred and as to whether Antonacci ever used Wheeler as an example at a meeting. (*See* Def.'s Resp. Pl.'s PFOF ¶ 30).

Construing the facts in the light most favorable to Wheeler, the Court has also considered that alleged incident. Viewed objectively, Antonacci's comments that he would have to get to know her likes, dislikes, and what turned her on would have been humiliating to Wheeler – particularly given Antonacci's behavior at Tumbleweeds. However, his comment was not accompanied by any physical behavior and was an isolated remark at the meeting.

Overall, in considering Antonacci's conduct, the Court notes that Wheeler was not confronted with Antonacci on a day-to-day basis. He worked in the St. Louis office and was only at the Milwaukee headquarters about four times a year. He spoke to Wheeler over the telephone once a month about her inside sales efforts. Antonacci was physically present when he observed Wheeler making telephone sales calls and he also conducted an OSHA training meeting at Brady headquarters.

Despite his offensive conduct, Wheeler was comfortable enough with Antonacci to call him in mid-to-late July 2007 when she was troubled by the Team Lead choice. She chose to talk to him about that issue and was comfortable talking to him about any business-related issues. Despite the factual disputes as to the precise dates of the occurrences, as of July 2007, the kiss had occurred, the dinner invitations had been issued, and the Tumbleweeds meeting and the OSHA meeting had taken place. Wheeler's decision to telephone Antonacci

to discuss the choice for the Team Lead position provides some indication that, viewed objectively, Antonacci's conduct was not intolerable.

In considering whether Antonacci's conduct was objectively harassment, the Court notes that the Seventh Circuit Court of Appeals has considered numerous factual situations of alleged harassment to determine whether they rose to the level of a hostile work environment. The appeals court has said that "touching . . . increases the severity of the situation," *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001), and that "unwanted physical contact falls on the more severe side," *Magyar v. Saint Joseph Regional Med. Ctr.*, 544 F.3d 766, 771-72 (7th Cir. 2008). However, the appeals court has also said that "[t]here are some forms of physical contact which, although unwelcome and uncomfortable for the person touched . . . typically will not be severe enough to be actionable in and of themselves." *Hostetler*, 218 F.3d at 808. Under Wheeler's version of the events, Antonacci engaged in unwanted physical contact – he, on one occasion, touched her leg below her Capri pants hem and, on another, kissed her on the lips. Thus, the Court has considered appellate decisions that also involved touching.

A fine line exists between touching that is sufficiently severe and touching that does not constitute sex harassment as a matter of law. *Compare Patton v. Keystone RV Co.*, 455 F.3d 812, 816-17 (7th Cir. 2006) (allegation that the harasser's "hand was under [the plaintiff's] shorts, on her inner thigh, and touching her underwear" – as well as three other instances of physical contact, a few sexually charged comments, and alleged stalking, were sufficiently severe); *Worth*, 276 F.3d at 268 (touching of the plaintiff's "breast near the nipple

for several seconds is severe enough"); *Hostetler*, 218 F.3d at 807-09 (the harasser's forced

kissing (or tonguing) of the plaintiff, attempted second kiss, attempt to remove the plaintiff's

bra, and lewd remark sufficiently severe); *Doe v. City of Belleville*, 119 F.3d 563, 568, 576-77

(7th Cir. 1997), *vacated*, 523 U.S. 1001 (1998)(constant questioning of the male plaintiffs'

sex; ridiculing the plaintiffs for wearing an earring, threatening them with sexual assault, and

grabbing one of the plaintiffs' testicles to determine whether he was male or female

sufficiently severe), with *McPherson v. City of Waukegan*, 379 F.3d 430, 434, 439 (7th Cir.

2004) (pulling back the plaintiff's shirt once to see the type of bra she was wearing, suggestive

tone of harasser asking if he could make a "house call" when she called in sick, and pulling

back her tank top with his fingers insufficient); *Hilt-Dyson v. City of Chi.*, 282 F.3d 456,

463-64 (7th Cir. 2002)(the plaintiff's allegations that her supervisor rubbed her back, squeezed

her shoulder and stared at her chest during a uniform inspection while telling her to raise her

arms and open her blazer were isolated incidents that, even when taken together, did not create

a sufficient inference of a hostile work environment); *Adusumilli v. City of Chi.*, 164 F.3d 353,

361-62 (7th Cir. 1998)("four isolated incidents in which a co-worker briefly touched her arm,

fingers, or buttocks," teasing, ambiguous comments, and staring and attempting to make eye

contact, not sufficiently severe or pervasive); *Koelsch*, 46 F.3d at 706-08 (one instance where

the supervisor rubbed his foot against the` plaintiff's leg and another where he grabbed the

plaintiff's buttocks not sufficiently severe); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333,

337 (7th Cir. 1993)(assuming that two attempts by a supervisor to kiss the plaintiff were

insufficient; the supervisor also told the plaintiff that she was beautiful, asked her on dates,

mounted "I love you" signs in her work area, and placed his hand on the plaintiff's shoulder several times); *Saxton v. AT & T*, 10 F.3d 526, 528 (7th Cir. 1993) (placing hand on the plaintiff's leg above the knee several times, rubbing his hand once along the plaintiff's upper thigh, and kissing her for two to three seconds until the plaintiff pushed him away, and three weeks later "lurched" at the plaintiff from behind some bushes, not sufficient).

In comparison to cases involving touching, Antonacci's conduct hovers close to the line of what may objectively rise to the level of harassment. Nonetheless, the Court finds that, under the circumstances discussed, Antonacci's conduct was not sufficiently severe to create an objectively hostile work environment. Although the Court could end its analysis of Wheeler's sexual harassment claim at this juncture, it will address Brady's alternative contention that there is no basis for its liability.

### Basis for Brady's Liability

Brady maintains that, since Antonacci was not Wheeler's supervisor, it cannot be held liable for any harassment because it was not negligent in taking reasonable steps to discover and prevent the offensive conduct. In addition, it asserts that it is not liable for Antonacci's harassment because a mechanism for reporting the harassment existed but Wheeler delayed in using it.

Wheeler maintains that Antonacci was her supervisor because he supervised her daily activities and she reasonably believed that he was her supervisor. She asserts that Antonacci had apparent authority over her. Wheeler also contends that Brady has no affirmative defense because Wheeler suffered a tangible employment action because she was

forced into an undesirable assignment which caused her to lose compensation. Furthermore, Wheeler argues that even if she did not suffer a tangible employment action, Brady failed to take reasonable care to prevent the harassment and she appropriately attempted to avoid the harassment.

The standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker. *Rhodes*, 359 F.3d at 505 (citing *Faragher v. City of Raton*, 524 U.S. 775, 807-08 (1998); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 696-97 (7th Cir. 2001)). Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action. *Rhodes*, 359 F.3d at 505 (citing *Parkins v. Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)). Conversely, an employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has "been negligent either in discovering or remedying the harassment." *Rhodes*, 359 F.3d at 506 (citing *Parkins*, 163 F.3d at 1032)).

A supervisor is someone with the power to directly affect the terms and conditions of the plaintiff's employment. *Rhodes*, 359 F.3d at 506. It is well-established that "'[s]upervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes*, 359 F.3d at 506 (citing *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) ("'[T]he fact that an employer authorized one employee to oversee aspects of another employee's job performance does not establish a Title VII

40

supervisory relationship.'").  *Hall* held that the plaintiff's harasser did not qualify as a supervisor despite the fact that he: (1) exercised authority to direct the plaintiff's work operations; (2) provided input into her performance evaluations; and (3) was charged with training her and other less-experienced employees.  *Rhodes*, 359 F.3d at 506 (citing *Hall*, 276 F.3d at 355).

Although Wheeler attempts to characterize Antonacci as a supervisor, she has not presented evidence upon which a reasonable jury could conclude that he was a supervisor as that term is defined within the parlance of Title VII.   As with the harasser addressed in *Hall*,  Antonacci had some involvement with training Wheeler.  On one occasion, Antonacci observed Wheeler's telephone sales calls and provided suggestions for improvement. Although Antonacci had no involvement in Wheeler's day-to-day work, he did provide some oversight of her work by means of the monthly telephone calls when they discussed sales activity and objectives.  Wheeler also called him for work-related advice.  However, there is no evidence that Antonacci had the authority to directly affect the terms and conditions of Wheeler's employment.

Wheeler also maintains that Antonacci had apparent authority as her supervisor. In so contending, Wheeler cites the discussion of apparent authority set forth in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), which explains that apparent authority is relevant where the agent purports to exercise a power which he or she does not have, as distinct from where the agent threatens to misuse actual power.  *Id.* (compare *Restatement (Second) of Agency* (1957) § 6  (defining "power") with § 8 (defining "apparent authority")).

41

If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one. *Id.* (citing *Restatement* § 8, Comment c ("Apparent authority exists only to the extent it is reasonable for the third person dealing with the agent to believe that the agent is authorized")).

As of September 2005, Wheeler worked exclusively within Antonacci's region and as an inside sales representative was required to have a monthly phone call with Antonacci. In asserting that he had apparent authority over her, Wheeler relies on the monthly calls, additional calls that were not required, and Antonacci's title of regional manager suggesting that he managed the area that she worked in. However, the earliest she met Antonacci was in June 2006, when Wheeler believes the kiss occurred. Antonacci also told Wheeler at Tumbleweeds that Bartelt told him to have more interaction with Wheeler. In July of 2007, he told Wheeler to talk to her supervisor, Bartelt, to discuss her talent review. While Wheeler also maintains that he had observational authority over her, Antonacci only observed calls made by Wheeler on one occasion. It is also undisputed that Bartelt was Wheeler's immediate supervisor. Despite construing the facts and the reasonable inferences from those facts in the light most favorable to Wheeler, they do not provide a basis upon which a reasonable jury could conclude that Wheeler could reasonably believe that Antonacci conveyed the false impression that he was her supervisor.

Therefore, Brady would only be liable if it was negligent in discovering or remedying the harassment. *Rhodes*, 359 F.3d at 506. A defendant employer "will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures

once apprised of the harassment." *Id.* (quoting *Hostetler*, 218 F.3d at 809). Generally, an employer is not considered to be apprised of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Rhodes*, 359 F.3d at 506 (quoting *Silk v. City of Chi.*, 194 F.3d 788, 807 (7th Cir. 1999)).[21] The court of appeals has emphasized that "the law against sexual harassment is not self-enforcing." *Rhodes*, 359 F.3d at 507 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997)). Without employer knowledge of harassing conduct, the law does not require an employer to do more than promote general anti-harassment policies and training to ensure compliance with Title VII. *Rhodes*, 359 F.3d at 507 (quoting *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 569 (7th Cir. 2001)).

An employer may defend against harassment charges by showing it exercised reasonable care to discover and rectify promptly any sexually harassing behavior. *Durkin v. City of Chi.*, 341 F.3d 606, 612 (7th Cir. 2003). Since an employer is not omniscient, it must have notice or knowledge of the harassment before it can be held liable. *Id.* The court determines whether an employer had notice of sexual harassment by considering the channel for complaints of harassment. *Id.* (citing *Hall*, 276 F.3d at 356-57). When an employer designates a "point person" to accept complaints, "this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." *Durkin*, 341 F.3d at 612 (quoting *Parkins*, 163 F.3d at 1035).

---

[21]An employer may be charged with constructive notice where the harassment is sufficiently obvious. *See Rhodes*, 359 F.3d at 507 (citing *Mason*, 233 F.3d at 1046 n.8; *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1018 (7th Cir. 1996)). Wheeler does not argue that Brady had constructive notice of the harassment.

43

In this case, Brady has an established system for the prevention, reporting, and investigation of all types of discrimination including sexual harassment and retaliation for reporting sexual harassment, and it trained its employees regarding that system within 90 days of hiring an individual. The anti-discrimination policies were recapitulated annually by means of training on Brady's Code of Ethics which includes those policies. Brady's anti-harassment policy contains a complaint procedure that encourages employees to immediately report any complaints or concerns of any harassment to their supervisor or the Human Resources Department.

Wheeler argues that she notified Bartelt of the harassment that she was experiencing when she reported Antonacci's kiss, and again when she requested a transfer to the Southeast region. Notification of a supervisor is a recognized channel at Brady for making complaints. *See id.*

There are factual disputes about what Wheeler told Bartelt about the kiss and when the kiss arguably occurred. Determination of exactly what Wheeler told Bartelt about the kiss involves credibility issues which cannot be resolved on summary judgment. Nor can this Court make a credibility determination as to whether Bartelt mocked Wheeler following her report of the kiss. These factual disputes preclude the Court from making a determination as whether Brady failed to take an appropriate remedial response to Wheeler's purported complaint to Bartelt about the kiss.

While there is some evidence that Wheeler made an informal request to Bartelt that she be transferred to be the inside sales representative for the Southeast region, any such

request was made after July 13, 2007 – quite close to the August 7, 2007, date of Wheeler's complaint to the Human Resources Department. Moreover, although disputed, the only evidence that Wheeler made a connection between her request to transfer inside sales regions to problems with Antonacci's behavior is vague.[22] To the extent that Bartelt informally requested the Southeast region inside sales position, she has not presented any facts which might reasonably suggest that she was complaining of sexual harassment at that time. Therefore, Wheeler has presented insufficient evidence to present a genuine issue of material fact as to a second purported harassment complaint to Bartelt.

Despite the factual disputes about the kiss complaint to Bartelt, once Wheeler reported her complaints about Antonacci to the Human Resources Department, Stobba responded promptly. The same day that Wheeler reported the alleged harassment, Stobba interviewed Antonacci, Bartelt, and Klimowicz. The next week, Stobba and other members of the Human Resources Department conducted additional interviews of those individuals, and further investigated Wheeler's allegations. By August 23, 2007, Stobba and Bartelt informed Wheeler that she would be transferred out of Antonacci's region and to reassigned to the Mideast sales region in the same capacity. Furthermore, on August 27, 2009, after the completion of Brady's investigation of Wheeler's complaint, Brady issued a final written warning to Antonacci for violating its policy prohibiting sexual harassment and for requesting

---

[22]At her deposition, Wheeler testified that she told Bartelt that she was having "extreme problems" with Antonacci, he was not copying her on emails and they'd had a "difficult " relationship. (McDonald Decl. ¶ 2, Ex. A 107.) Wheeler also testified that she told Bartelt that things were "bad" between Antonacci and her, it was "very unprofessional," "uncomfortable," and she wanted "a clean, fresh, new start." (*Id.* at 138-39.) However, when Wheeler presented her complaint to Stobba, she told him that she had not brought up Antonacci's harassment when she asked Bartelt to transfer her to the Southeast region. (*See infra* at 13.)

pornography from Brady's IT personnel. Antonacci was advised not to have any contact with Wheeler and to stay away from her work area when he visited the Milwaukee headquarters. "[T]aking steps to physically separate employees and limit contact between them can make it 'distinctly improbable' that there will be further harassment. *See Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008). Brady also advised Antonacci that any further violations would be grounds for dismissal.

However, based on the factual disputes as what Wheeler told Bartelt about the kiss and Bartelt's response thereto, Brady has not met its burden of establishing that once it was apprised of the harassment it took appropriate remedial action. Therefore, at this juncture of the proceedings, Brady has not established that Wheeler's claim is barred because it acted promptly upon learning of Antonacci's actions.

### Retaliation

Brady also contends that Wheeler's retaliation claim must be dismissed on summary judgment because there is no credible evidence that she suffered an adverse employment action after she complained about Antonacci. Wheeler contends that her transfer to the inside sales representative for the Mideast region was an adverse employment action under all three categories identified by the court of appeals, citing *Tart v. Illinois Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004).

Title VII protects employees from retaliation as a result of their discrimination complaints. *Hobbs v. City of Chi.*, 573 F.3d 454, 463 (7th Cir. 2009) (citing 42 U.S.C.

46

§ 2000e-3(a)). An employee can establish a *prima facie* case for retaliation under either the direct or indirect method. *Roney v. Ill. Dep't of Trans.*, 474 F.3d 455, 459 (7th Cir. 2007). Wheeler proceeds under the direct method,[23] which requires her to show that: (1) she engaged in a statutorily protected activity; (2) an adverse action was taken against her by her employer; and (3) there is a causal connection between the two. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007). The adverse act must be such that it would "dissuade a reasonable employee from making or supporting a claim of discrimination." *Hobbs*, 573 F.3d at 463 (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "Examples of such an action would include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993)." *Lapka*, 517 F.3d at 987. As the court of appeals has cautioned, "'not everything that makes an employee unhappy is an actionable adverse action.'" *Lapka*, 517 F.3d at 987 (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). Under the direct method, a plaintiff may offer circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Boumehdi*, 489 F.3d at 792.

---

[23]Wheeler has not attempted to establish her retaliation claim under the indirect method. (*See* Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 27-28.)

Wheeler bases her retaliation claim on her transfer to the Mideast region; isolation from her co-workers and teammates and the failure to support her when she complained about her transfer and her treatment; and the fact that she was told that she was expected to attend the National Sales Meeting, unless she had a medical excuse – although she had been excused the preceding year to participate in a wedding.

In *Tart*, 366 F.3d at 475, the court of appeals reviewed three categories of cases that courts found satisfied the criteria for materially adverse employment action: (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including when employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing her from using the skills in which she is trained and experienced; and (3) "cases in which the employee is not moved to a different job or the skill requirements of [her] present job altered, but the conditions in which [she] works are changed in a way that subjects [her] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [her] workplace environment – an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet." *Id.* (quoting *Herrnreiter v. Chi. Housing Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2004)).

In this case, there is no dispute regarding the first prong of Wheeler's retaliation claim. However, Brady asserts that there was no adverse employment action. As to the reduced communication with Bartelt, Brady also maintains that there was no causal

relationship between Wheeler's complaint. Rather, Brady contends that the reduced communication with Bartelt was due to Zweck's addition as team lead which reduced Bartelt's need to communicate with the inside sales representatives.

At Wheeler's request, she was transferred from the Northeast region to a similar inside sales position with the same salary structure. Although Wheeler would have preferred the Southeast region, the opening for that position had been posted and interviews had been conducted by August 7, 2007, when Wheeler lodged her harassment complaint with Human Resources Department. The August 7, 2007, date of Wheeler's complaint to Stobba, coincided with Welch's acceptance of the Southeast region inside sales representative position. Wheeler's commissions in the Mideast were lower than in the Northeast region. However, the statistical evidence regarding the sales leads and achievement of sales goals for 2007 indicates that the two areas were roughly equivalent. Thus, despite construing the evidence and the reasonable inferences from that evidence in the light most favorable to Wheeler, a reasonable jury could not find that Wheeler's transfer to the Southeast region was an adverse employment action.

Wheeler also perceived that she was being isolated from her coworkers and teammates, and that Bartelt was treating her differently. Being treated differently may constitute an adverse employment action. However, despite construing the evidence of those problems in the light most favorable to Wheeler, the evidence does not establish a basis upon which a reasonable jury could find that they constituted "significantly negative alteration" in Wheeler's workplace environment. *See Tart*, 366 F.3d at 475.

The requirement that Wheeler attend Brady's National Sales Meeting also does not constitute a materially adverse employment action. Although Wheeler was told that she would be required to attend the meeting, Antonacci was directed to stay away from Wheeler. Bartelt also assured Wheeler that she would make sure that there was no interaction between Antonacci and her. Moreover, Wheeler was able to avoid attending that meeting by furnishing a medical excuse. Under such circumstances, a reasonable jury could not find that being required to attend the National Sales Meeting was a materially adverse employment action. The Court concludes that there is not sufficient evidence upon which a reasonable jury could find for Wheeler on the adverse employment action prong of her retaliation claim. Based on the foregoing, Wheeler's retaliation claim is dismissed.

### Constructive Discharge

Wheeler also maintains that she was constructively discharged from her position. Ordinarily a plaintiff "is expected to remain on the job while seeking redress" for her employer's discriminatory actions. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 639 (7th Cir. 2009)(quoting *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 427 (7th Cir. 2004)). In *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143 (2004), the Supreme Court acknowledged explicitly that Title VII encompasses employer liability for constructive discharge. Nonetheless, the Supreme Court emphasized that, although a plaintiff may establish a hostile work environment by showing that she has been subjected to severe or pervasive harassment, a "further showing" is necessary to establish a constructive discharge. *See Porter*, 576 F.3d at 639 (citing *Suders*, 542 U.S. at 134). Specifically, a plaintiff "must

show that the abusive working environment became so intolerable that [her] resignation qualified as a fitting response." *See Porter*, 576 F.3d at 639 (quoting *Suders*, 542 U.S. at 134); *see also Boumehdi*, 489 F.3d at 789 ("To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made her working conditions so intolerable that a reasonable person would be forced to resign." (citing *Suders*, 542 U.S. at 147)).

    Wheeler's constructive discharge claim is based upon the harassing conduct, including Bartelt's response to Wheeler's supposed reporting of the harassment beginning with the unwanted kiss. However, even if all those factual disputes are considered in the light most favorable to Wheeler, she has not presented sufficient evidence upon which a reasonable jury could find that the harassment made her working conditions so intolerable that a reasonable person would be forced to resign. Once Wheeler conveyed her complaints to Stobba and the matter was investigated, Wheeler was assigned to another sales region. Antonacci was instructed to have no contact with her, and he was issued a final written warning. Wheeler's subsequent complaint, that Bartelt was treating her differently, was investigated and an explanation for the reduction in contact provided. Wheeler was also able to avoid attending the National Sales Meeting, albeit by means of a medical excuse. Although Wheeler considered the Mideast sales region not to be comparable to the Northeast region and her commissions were reduced, the statistics do not support her claim that it was a lesser territory. Therefore, Wheeler's constructive discharge claim is dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Brady's motion for summary judgment (Docket No. 18) dismissing Wheeler's Title VII discrimination claims against it based on sexual harassment, retaliation and constructive discharge is **GRANTED**;

This action is **DISMISSED**; and,

The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 6th day of May, 2010.

**BY THE COURT**

*s/ Rudolph T. Randa*
**Hon. Rudolph T. Randa**
**U.S. District Judge**